UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| LINDA YOUNGBLOOD ) | |
| ) | |
| v. ) | No. 3:09-0303 |
| ) | Judge Cambpell/Bryant |
| THE PRUDENTIAL INSURANCE COMPANY ) | |
| OF AMERICA ) | |

To:   The Honorable Todd J. Campbell, Chief Judge

REPORT AND RECOMMENDATION

This case has been referred to the undersigned Magistrate Judge to dispose, or recommend disposition, of pretrial motions pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B). (Docket Entry No. 5). Currently pending is plaintiff's Motion to Extend the Initial Case Management Deadline to Amend Pleadings (Docket Entry No. 23), as well as plaintiff's motion to amend complaint (Docket Entry No. 18), by which she seeks leave to file an amended complaint naming an additional defendant, Reliable Review Services ("RRS"), and adding new claims of a violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., (Count II), a conspiracy to violate the ADA (Count III), and a conspiracy to violate ERISA (Count IV). For the reasons that follow, the Magistrate Judge recommends that plaintiff's motions to extend the deadline for amending pleadings and for leave to amend her complaint be DENIED.

Statement of the Case

Plaintiff, a former employee of Trevecca Nazarene University and participant

1

in that University's Employee Welfare Plan, filed her complaint in this case on March 23, 2009, alleging that Prudential, the administrator for the Plan, wrongfully denied her application for long-term disability benefits, in violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. (Docket Entry No. 1) Defendant Prudential filed its answer denying liability. Thereafter, the undersigned entered an initial case management order directing Prudential to file a transcript of the administrative record by August 1, 2009; establishing September 1, 2009 as the deadline for moving to amend the pleadings or to name additional defendants; and establishing October 12, 2009 as the deadline for filing cross-motions for judgment on the pleadings. (Docket Entry No. 12) After receiving permission to file a paper copy of the administrative record, Prudential made that filing on August 12, 2009.

Nearly six weeks later, on October 8, 2009, plaintiff filed an unopposed motion to extend the fast-approaching deadline for filing dispositive motions, citing her anticipated amendment to include ADA claims in this suit, and the likelihood that Prudential would oppose the additional claims with a Rule 12(b)(6) motion to dismiss. (Docket Entry No. 17) One day later, plaintiff filed the pending motion to amend. As grounds for her motion, plaintiff stated merely that her ADA-based claims are filed in response to a "right-to-sue" letter received by plaintiff from the EEOC on that same day, October 9, 2009. (Docket Entry No. 18).[1]

Defendant Prudential Insurance Company of America ("Prudential") has filed its response in opposition to plaintiff's motion to amend (Docket Entry No. 21). In its

---

[1] Plaintiff did not file a memorandum of law in support of her motion to amend her complaint. See Local Rule 7.01.

memorandum, Prudential argues that plaintiff's motion to amend should be denied because: (1) plaintiff's motion is untimely pursuant to the deadlines in the case management order and (2) to allow plaintiff's proposed amendments would be futile as a matter of law. Plaintiff has filed a reply to these arguments (Docket Entry No. 22).

## Analysis

### Good cause to amend the Initial Case Management Order

As a general rule, "the court should freely give leave [to amend pleadings] when justice so requires." Fed.R.Civ.P. 15(a)(2). Here, however, defendant argues that plaintiff's motion to amend should be denied as untimely. The initial case management order established September 1, 2009, as the deadline for filing motions to amend the pleadings (Docket Entry No. 12, ¶ VI). Without seeking an extension of this deadline,[2] plaintiff filed her motion to amend her complaint on October 9, 2009. Plaintiff's motion makes no direct reference to its untimeliness, but, at least by implication, suggests that its timing depended upon plaintiff's receipt, on October 9, 2009, of a "right-to-sue" letter from the EEOC.

In response to plaintiff's motion, Prudential argues that once a Rule 16(b) scheduling order is entered it "may be modified only for good cause and with the judge's consent." Fed.R.Civ.P. 16(b)(4). This "good cause" requirement is "a threshold that requires late-moving litigants to show that 'despite their diligence they could not meet the original deadline.'" Shane v. Bunzl Distribution USA, Inc., 275 Fed. Appx. 535, 536 (6th Cir. Apr. 30,

---

[2]Plaintiff did not file her Motion to Extend the Initial Case Management Deadline to Amend Pleadings until November 3, 2009.

3

2008) (quoting Leary v. Daeschner, 349 F.3d 888, 907 (6th Cir. 2003)). The Leary court clarified the law of the circuit with regard to the intersection between Rule 15(a) and Rule 16(b), holding that "[o]nce the scheduling order's deadline passes, a plaintiff first must show good cause under Rule 16(b) for failure earlier to seek leave to amend before a court will consider whether amendment is proper under Rule 15(a)." 349 F.3d at 909 (citing Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1419 (11th Cir. 1998)). The court further held "that a determination of the potential prejudice to the nonmovant also is required when a district court decides whether or not to amend a scheduling order." Id.

Prudential maintains that plaintiff cannot demonstrate her inability to meet the original deadline despite due diligence. In support of this argument, Prudential asserts: (1) that the factual bases for the new claims in plaintiff's proposed amended complaint are all found in her claim file; (2) that a copy of plaintiff's claim file was provided to her lawyer in January 2009 (Admin. record, Docket Entry No. 16, pp. 645-46); and (3) that plaintiff did not file her charge of discrimination before the EEOC until September 24, 2009 (Docket Entry No. 21-3), after the September 1, 2009, deadline for filing motions to amend the pleadings had passed. In reply to this argument, plaintiff's counsel does not dispute Prudential's assertion that the factual bases for the motion to amend were in his possession as early as January 2009, but relies on the liberal standard of Rule 15 in seeking to have plaintiff's amendment allowed, as well as the evidence that, following Prudential's filing of the administrative record on August 12, 2009, she proceeded with dispatch in making her filings with the EEOC and, thereafter, with this court. (Docket Entry No. 22-1 at 1-4)

Ignored in plaintiff's reply is the law of this circuit, set out above and in Prudential's response brief, that the threshold requirement here is a showing of good cause

4

for failure to comply with the scheduling order's original deadline, i.e., a showing that despite her diligence she could not have filed her motion to amend or a motion to extend the deadline by September 1, 2009.  See Leary, 349 F.3d at 907.   Admittedly, once the administrative record was filed on August 12, 2009, plaintiff proceeded diligently in advancing her charges under the ADA (though her charge of discrimination before the EEOC was dated September 24 and was stamped received on October 1 (see Docket Entry No. 21, Exh. 3), contrary to plaintiff's allegation that she filed said charge on August 13, 2009 (Docket Entry No. 18-1, para. 55; Docket Entry No. 22-1 at 2)).  However, plaintiff makes no showing of good cause for her failure to seek a timely extension of the deadline for amending the pleadings.  It is implied in plaintiff's reply brief that her ability to make a timely filing was constrained by the date on which Prudential filed the administrative record (less than three weeks prior to the deadline for amendments), as well as the time it took the EEOC to process her charge of discrimination.  However, it appears that plaintiff was provided a copy of the claim file maintained by Prudential -- including the reports which undergird the claims plaintiff seeks to include in an amended complaint -- as early as January 2009.  There is no explanation from plaintiff as to why it took until late September to decide to pursue her charge of discrimination.  Moreover, a motion to extend the deadline for amendment need not have awaited the EEOC's notice of suit rights.  Indeed, plaintiff properly filed her motion to continue the dispositive motion deadline in advance of that deadline, without the EEOC's notice in hand.  (Docket Entry No. 17)  The undersigned cannot find good cause from the circumstances cited by plaintiff.

       As to potential prejudice to Prudential, the undersigned finds this factor manifestly established here, despite plaintiff's assertion to the contrary and the fact that

5

Case 3:09-cv-00303   Document 27   Filed 12/10/09   Page 5 of 20 PageID #: 122

plaintiff's motion to amend was filed only thirty-eight days late. Whereas Prudential need only submit a merits brief defending its decision to deny disability benefits under the scheduling order as it now stands in this ERISA case, allowing the modification of that order for purposes of entertaining plaintiff's motion to amend would potentially place Prudential in position to defend claims subject to full blown discovery and plaintiff's demand for trial by jury. Allowing the desired amendment would thus create significant prejudice to Prudential. See Duggins v. Steak 'N Shake, Inc., 195 F.3d 828, 834 (6th Cir. 1999).

In sum, the Magistrate Judge cannot find good cause justifying amendment of the scheduling order, as requested in plaintiff's motion for same (Docket Entry No. 23) so as to allow her late-filed motion to amend the complaint (Docket Entry No. 18). It is therefore recommended that these motions be DENIED.

### Futility of the Amendment

In the alternative, if the District Judge is inclined to find the demands of Rule 16 and Leary, et al. satisfied here, the undersigned would recommend denial of leave to amend plaintiff's complaint on the ground that such amendment would be futile. See, e.g., Thiokol Corp. v. Dep't of Treasury, 987 F.2d 376, 382-83 (6th Cir. 1993) (reciting that the "freely given when justice so requires" standard of Rule 15 does not encompass proposed claims that would not withstand a motion to dismiss and are thus futile).

Prudential argues that the facts pled in support of plaintiff's proposed additional claims under the ADA and the common law of conspiracy fail to state a claim upon which relief can be granted. In considering the applicability of this defense under Fed.R.Civ.P. 12(b)(6), the court "must accept all well-pleaded factual allegations of the

6

Case 3:09-cv-00303   Document 27   Filed 12/10/09   Page 6 of 20 PageID #: 123

complaint as true and construe the complaint in the light most favorable to the plaintiff."
Inge v. Rock Finan. Corp., 281 F.3d 613, 619 (6th Cir. 2002). Prudential's primary argument against plaintiff's proposed amendment is that neither itself nor RRS was plaintiff's "employer" for purposes of the ADA, nor was plaintiff otherwise an "employee" for purposes of that statute. Prudential further argues that plaintiff's proposed amended complaint otherwise fails to sufficiently allege a violation of the ADA, or a conspiracy to violate that statute, and that her claim of conspiracy to violate ERISA is either unviable or preempted by that statute.

1. ADA claims

In reply to Prudential's arguments, plaintiff argues that Prudential miscasts her ADA claims as employment related claims brought under subchapter 1 of the ADA, when in fact her ADA claims are based upon subchapter IV of the statute. Subchapter IV of the ADA is entitled "Miscellaneous Provisions," and the specific section pursuant to which plaintiff claims is 42 U.S.C. § 12203(b), prohibiting, inter alia, interference in any individual's exercise or enjoyment of ADA-protected rights. For the sake of context, the entirety of section 12203 is set out below:

§ 12203. Prohibition against retaliation and coercion

(a) Retaliation

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

(b) Interference, coercion, or intimidation

7

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.
>
> (c) Remedies and procedures
>
> The remedies and procedures available under section 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter 1, subchapter II and subchapter III of this chapter, respectively.

42 U.S.C. § 12203.

Plaintiff argues that her claim under this section does not require the existence of an employer-employee relationship between herself and Prudential. Rather, she argues that for purposes of her interference claim, it is enough to allege that Prudential is <u>an</u> employer as defined in subchapter 1, 42 U.S.C. § 12111(5)(A), and that she was an "employee" and a "qualified individual with a disability" as defined in § 12111(4) and (8) -- allegations that will secure her ability to pursue the remedies identified in subchapter 1 through the vehicle of § 12203(c), despite the fact that her unemployed status at the time of the alleged violation of her statutory rights would clearly prevent her from claiming directly under subchapter 1, <u>see</u> <u>McKnight v. General Motors Corp.</u>, 550 F.3d 519 (6th Cir. 2008) (holding that subchapter 1 is unambiguous, and does not by its plain language apply to former employees). (Docket Entry No. 22 at 5-6)

From this complex legal premise, plaintiff alleges a violation of § 12203(b) and a conspiracy to violate that section by Prudential and RRS, "by manufacturing and using a fraudulent assessment of Youngblood's medical records to bolster Prudential's rationale for

8

denying Youngblood's claim for ADA-protected benefits." (Docket Entry No. 18-1, ¶ 53) However, even if an employer-employee relationship (or its proxy) is not required to claim the protections of subchapter I vis-à-vis subchapter IV, and plaintiff has properly pled her legal entitlement to claim against these defendants for the alleged violation of § 12203(b), the undersigned finds that her pleading of the unlawful interference itself is deficient, as explained below.

The pertinent allegations of plaintiff's proposed amended complaint are as follows:

22. On or about November 21, 2007, Prudential denied Youngblood's claim for long-term disability benefits.

23. On or about May 14, 2008, Youngblood timely appealed Prudential's initial administrative denial.

24. On or about May 21, 2008, Prudential asked RRS to provide an assessment of the severity of Youngblood's psychological and pulmonary problems.

. . .

26. On or about June 5, 2008, Prudential received assessments of Youngblood's pulmonary and psychological problems from RRS.

27. RRS represented to Prudential that the assessment of Youngblood's psychological problems had been completed by Marcus Goldman, M.D., a board certified psychiatrist.

28. RRS represented to Prudential that the assessment of Youngblood's pulmonary problems had been completed by Leonard Sonne, M.D., a board certified pulmonologist.

29. Both assessments concluded that Youngblood was not disabled.

9

30. On or about June 10, 2008, Prudential denied Youngblood's first appeal.

31. On or about October 7, 2008, Youngblood timely appealed Prudential's June 10, 2008 decision to deny her claim.

32. Youngblood provided Prudential with additional records and a treating source medical statement in support of her October 7 appeal.

33. In response to Youngblood's appeal, Prudential requested a medical records assessment of Youngblood's pulmonary problems from MES Solutions.

34. On or about November 17, 2008, MES Solutions provided Prudential with an assessment of Youngblood's pulmonary problems that supported Youngblood's claim for disability benefits.

35. Two weeks after Prudential received MES's assessment, Prudential asked RRS to obtain an assessment of the MES assessment that Youngblood was disabled by her pulmonary problems.

36. Prudential specifically instructed RRS to obtain this assessment from Dr. Sonne [(the pulmonologist who had previously found Youngblood not disabled)].

37. On or about December 12, 2008, RRS provided Prudential with an assessment of the MES assessment.

38. RRS attributed its December 12 assessment to Dr. Sonne.

39. RRS's December 12 assessment disputed MES's assessment and opined Youngblood was not disabled.

40. The Clinical History section of RRS's December 12, 2008 assessment attributed to Dr. Sonne was identical, word for word, typo for typo, with the Clinical History section of RRS's June 5, 2008 assessment that RRS attributed to Dr. Marcus Goldman [(the psychiatrist who had previously found Youngblood not disabled)].

41. Accordingly, RRS's December 12, 2008 assessment was fraudulent.

42. RRS knew that Prudential would use its fraudulent assessment that Youngblood was not disabled in determining Youngblood's claim for disability benefits.

43. Prudential knew, or should have known, that RRS's December 12, 2008 assessment attributed to Dr. Sonne was fraudulent.

44. On or about December 23, 2008, Prudential denied Youngblood's claim for long-term disability benefits.

45. Prudential used RRS's December 12, 2008 fraudulent assessment to bolster its rationale for denying Youngblood's disability claim.

. . .

59. Prudential signaled its desire and expectation for an assessment that Youngblood was not disabled by (1) providing RRS with a copy of the assessment by MES Solutions that found Youngblood to be disabled, (2) by asking for Dr. Sonne, who had already opined that Youngblood was not disabled, to review the MES assessment that Youngblood was disabled, and (3) by including irrelevant or disputed allegations in the material for RRS to review.

60. Accordingly, RRS knew and understood that Prudential wanted and expected an assessment that would support the denial of Youngblood's claim.

61. On December 12, 200[8], RRS fulfilled Prudential's expectations by manufacturing and providing Prudential with a document that disputed MES's assessment and that supported Prudential's denial of Youngblood's claim.

62. RRS's December 12 assessment was falsely attributed to Leonard Sonne, M.D.

(Docket Entry No. 18-1 at 4-8)

Prudential argues that the above allegations simply do not implicate the ADA,

but are properly considered only as support for plaintiff's original ERISA cause of action. (Docket Entry No. 21 at 9) "To survive a motion to dismiss, the complaint must present 'enough facts to state a claim to relief that is plausible on its face.'" Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield, 552 F.3d 430, 434 (6th Cir. 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)). The court must take all factual allegations as true in considering whether plaintiff's proposed amended complaint would survive a motion to dismiss for failure to state a claim, and must draw all reasonable inferences in her favor. Id. However, that presumption of truth does not apply to legal conclusions, nor will the court accept unwarranted factual inferences. Id. Accordingly, the undersigned would decline to accept the truth of the allegations declaring fraudulent the December 12, 2008 assessment provided by RRS and attributed to Dr. Sonne, simply because it included a clinical summary that had been produced by another RRS consultant, Dr. Goldman. Nonetheless, even assuming that Prudential sought, and RRS produced, a report in response to the MES Solutions report that was predisposed to bolster the initial finding of nondisability, such charges are not sufficient to state a claim under 42 U.S.C. § 12203(b). Plaintiff describes her "core allegation" under this statute as follows:

> Youngblood does not accuse Prudential of *discriminating* against her. Rather, she accuses it of *interfering* in her ADA-protected benefits. Black's Law Dictionary, Fifth Edition, p. 730, defines "*Interfere*" as "to check; hamper; hinder; infringe; encroach; trespass; disturb; intervene; intermeddle; interpose." This definition described exactly what Prudential and RRS did. They "checked, hampered, hindered, disturbed...and intermeddled" in Youngblood's ADA-protected disability benefits by manufacturing and using a fraudulent medical assessment to bolster Prudential's rationale for denying her claim.

(Docket Entry No. 22 at 7)

12

In Brown v. City of Tucson, 336 F.3d 1181 (9th Cir. 2003), the Ninth Circuit considered this same argument in determining the framework for analyzing an interference claim under § 12203(b). The district court in that case had found it appropriate to apply "existing Title VII employment standards" to the analysis of an ADA interference claim under § 12203(b), since courts had consistently applied such standards to ADA retaliation claims under § 12203(a). Id. at 1188-89.[3] On appeal to the Ninth Circuit, Brown argued, inter alia, that the plain, dictionary meaning of the word "interfere" should be applied in analyzing the validity of her § 12203(b) claim, thus obviating the need to look to Title VII or any other statute for an analytical standard to import. Id. at 1190. However, while the Ninth Circuit determined that the district court erred in utilizing the Title VII framework to analyze the sufficiency of Brown's interference claim, it declined to allow the analysis to be guided by the dictionary definition of the word. Instead, the court found "[m]ore persuasive ... Brown's and *amici's* citation to the anti-interference provision in the Fair Housing Act ("FHA"), 42 U.S.C. § 3617, a provision that was itself referenced in a Committee Report preceding the passage of the ADA." Id. at 1191 (citing H.R.Rep. No. 485(II), 101st Cong., 2d

---

[3]Indeed, all of the circuit courts of appeal have approved the use of the Title VII burden-shifting formula in the analysis of ADA retaliation claims under § 12203(a). See Smith v. District of Columbia, 430 F.3d 450, 455 (D.C. Cir. 2005) (collecting cases). It does not appear that the Sixth Circuit has opined on the construction of § 12203(b), however. In a decision predominantly addressed to the Eleventh Amendment immunity of the state defendant, the en banc Sixth Circuit considered a claim for retaliation outside of the employment context, and in so doing recited the language of subsection (b) in addition to subsection (a) of § 12203, but without expounding on the formula for analyzing the sufficiency of an interference claim. Popovich v. Cuyahoga Co. Court of Common Pleas, 276 F.3d 808, 816 n.7 (6th Cir. 2002) (en banc). The majority of circuit courts have treated subsection (b) as simply an additional retaliation provision (though with a reach somewhat expanded from that of subsection (a)), and subjected claims thereunder to the same analysis; prior to Brown, the courts that had differentiated subsection (b) from subsection (a) did so without detailing any meaningful analytical distinction between the two. See Brown, 336 F.3d at 1189 n.13.

13

Sess. 138 (1990) *reprinted in* 1990 U.S.C.C.A.N. 303, 421 ("The Committee intends that the interpretation given by the Department of Housing and Urban Development to a similar provision in the Fair Housing Act ... be used as a basis for regulations for this section.")). The court further noted that the anti-interference provisions of the ADA and the FHA are not merely similar, but identical, and that "similarities between statutory provisions are an indication that Congress intended the provision to be interpreted the same way." Id. (citing Northcross v. Bd. of Educ. of Memphis City Schs., 412 U.S. 427, 428 (1973)).

The question of how to analyze the viability of a claim under § 12203(b) appears to be an open one in this circuit. The undersigned concurs with the Brown court that claims of interference with ADA-protected rights should be construed in accordance with the standards applied to claims of interference with FHA-protected rights. While the court in Brown did not need to resolve the issue of precisely what constitutes "interference," it quoted the Sixth Circuit in delineating that "[c]learly, anti-interference provisions such as those contained in the FHA and ADA cannot be so broad as to prohibit 'any action whatsoever that in any way hinders a member of a protected class.'" Id. at 1192 (quoting Mich. Prot. & Advocacy Serv. v. Babin, 18 F.3d 337, 347 (6th Cir. 1994)).

In Babin, the Sixth Circuit analyzed the anti-interference provision of the FHA, and concluded that in order to "rise to the level of 'interference with' the rights of the plaintiffs," the alleged interference must have been motivated by a discriminatory animus. 18 F.3d at 347. A defendant in that case whose motivation for selling the property at issue to a party outside of the protected class was purely economic could not be liable for interference under 42 U.S.C. § 3617. Id. at 348. Though this requirement of a discriminatory animus has since been challenged based on the plain language of § 3617 --

14

which, like § 12203(b), does not include any requirement of discriminatory motive on the part of the interferor, but only requires that the interference be "on account of" the exercise or enjoyment of protected rights -- the Sixth Circuit rejected that challenge as contrary to the law of the circuit established in Babin. Campbell v. Robb, 162 Fed.Appx. 460, 473-74 (6th Cir. Jan. 9, 2006). Indeed, the court in Campbell recognized that even *retaliatory* animus is insufficient to support an FHA interference claim under circuit law. Id. Thus, at least in this circuit, interference with FHA-protected rights is only actionable if the acts of interference were motivated by discriminatory animus. Mere hindrance of an applicant's claim to the benefits accorded her by the statute, without a discriminatory motive, does not constitute interference.

In agreement with the Brown court that the analysis here should not be guided by the dictionary definition of "interfere,"[4] but rather by the interpretation of the identical anti-interference provision of the FHA, and consistent with Babin and Campbell, the undersigned finds that in order for the actions of Prudential and RRS to rise to the level of actionable interference with plaintiff's ADA-protected rights pursuant to § 12203(b), those actions must have been taken because of plaintiff's alleged disability, and not because of their desire to avoid paying benefits to which plaintiff alleges her entitlement, or for any other

---

[4]Indeed, it has been observed that defining interference in this manner takes it out of the context provided by the statute, in violation of the canon of construction that "'[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.'" Hunt v. Meharry Med. College, 2000 WL 739551, at *7 (S.D.N.Y. June 8, 2000) (quoting 2A Sutherland, Statutes and Statutory Construction § 47.17 (5th ed. 1991)). "Here, this canon requires construing 'interfere' with reference to 'coerce,' 'intimidate,' and 'threaten' such that 'interfer[ing]' with a person means doing something more than merely [denying] his ADA rights" -- something that is more in line with the unseemly conduct which the statute also proscribes, conduct that evinces an animosity toward the disabled for pursuing her statutory entitlement. Id.

15

reason.  Cf. Dedyo v. Baker Eng'g New York, Inc., 1998 WL 9376, at *11 (S.D.N.Y. Jan. 13, 1998) (rejecting attempt to pursue a claim of discrimination under ADA for alleged conspiracy to deny short-term disability benefits due to insufficient showing that claimant was denied such benefits because of his disability; "As other courts have commented, the *sine qua non* of an ADA claim is that the plaintiff was treated differently 'because of' his impairment.").  Plaintiff's proposed amended complaint contains no such allegation of discriminatory animus on the part of Prudential or RRS, as confirmed in her reply brief when she distinguishes the alleged interference from any form of discrimination.  Accordingly, the proposed amended complaint fails to state a claim for interference under § 12203(b), and the allowance of amendment to include that claim would therefore be futile.

Conversely, the extent to which similar allegations are properly considered in connection with an ERISA claim is well established.[5]  The built-in incentive for a paid consultant to give the benefit of any doubt regarding disability to the benefits plan which pays his fee has been observed in the cases, e.g., Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832 (2003), as has the administrator's incentive to contract with consultants who are inclined to find in its favor, Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston, 419 F.3d 501, 507-08 (6th Cir. 2005).  These incentives are to be duly considered upon review of

---

[5]See generally Potter v. Xerox Corp., 88 F.Supp.2d 109, 111-12 (W.D.N.Y. 2000) ("The gist of plaintiff's [ADA] claim against [the plan administrator] is that [it] allegedly 'misrepresent[ed] and falsif[ied] information and data' regarding plaintiff's condition and that it 'engaged in fraudulent conduct' toward plaintiff. ... All that plaintiff alleges is that [the administrator] should have found him eligible for benefits.  His claim, then, is more in the nature of a claim for benefits under [ERISA]." (citing, e.g., McDonald v. Massachusetts, 901 F.Supp. 471, 478-79 (D. Mass. 1995) ("The plaintiff does not contend that he has been denied any benefits 'by reason of' any disability.  Rather, [the plaintiff] asserts, fundamentally, that on account of his disability, he is due benefits that have not been provided.  Such a claim, quite simply, is not cognizable under the ADA")).

16

the administrator's decision pursuant to ERISA, Calvert v. Firstar Fin., Inc., 409 F.3d 286, 292 (6th Cir. 2005), as they would be in any other context where experts for hire are utilized.

As particularly alleged here, any showing that Prudential tampered with, inappropriately influenced, or solicited the outright manufacturing of the December 12, 2008 assessment attributed to Dr. Sonne could lead to the conclusion that Prudential acted arbitrarily and capriciously in relying on that assessment. Kalish, 419 F.3d at 507. See also McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 171 & n.12 (6th Cir. 2003) (finding a denial of LTD benefits arbitrary and capricious because it was premised on a medical consultant's second report, produced after a very suggestive call for clarification of his first report by the insurance company; "although there was nothing untoward about Western-Southern contacting Dr. Clary in order to have him clarify his initial report, it is noteworthy that Dr. Clary became more definite in his opinion [that the plaintiff was not disabled] only after he was contacted by Western-Southern."). Therefore, as recognized by Prudential, the substance of these allegations is properly asserted as argument in plaintiff's motion for judgment on the administrative record, in connection with her original ERISA cause of action.

In light of the futility of plaintiff's proposed interference claim under 42 U.S.C. § 12203(b), her proposed claim for conspiracy to interfere with ADA-protected rights must likewise be disallowed as futile.

2. Conspiracy to violate ERISA

Finally, with regard to plaintiff's proposed amendment to include a claim of conspiracy to violate ERISA, Prudential argues simply that no such cause of action exists, and that "[t]he civil enforcement provision of 29 U.S.C. § 1132 provides the exclusive remedy for

17

benefits relating to ERISA plans." (Docket Entry No. 21 at 9-10 (citing Cippolone v. University of Penn., 1998 WL 47285, at *2 (E.D. Pa. Feb. 3, 1998)). In reply, plaintiff clarifies that her conspiracy claim is not based on § 1132; "[r]ather, Youngblood complains that RRS and Prudential conspired to violate her rights protected by [29] U.S.C. § 1133 and 29 C.F.R. § 2560.[5]03-1." (Docket Entry No. 22 at 7) Regarding Prudential's citation to Cippolone, that court observed that there is no *statutory* authority for a claim of conspiracy to violate ERISA. That much appears to be true, and plaintiff does not argue otherwise. Moreover, this claim does not seek an award of benefits, as such, that would challenge the exclusivity of 29 U.S.C. § 1132(a)(1)(B). Rather, it seeks equitable remedies under § 1132(a)(3) vis-à-vis § 1133 -- presumably the language of that section requiring that "every employee benefit plan shall- ... (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim" -- and the regulatory provision that implements § 1133. At the same time, however, the prayer for relief on this claim also includes the request for compensatory and punitive damages -- tort relief that is not available to redress the improper processing of benefit claims under the relevant provisions of ERISA. Massachusetts Mut. Life Ins. Co. v. Russell, 437 U.S. 134 (1985); see Mertens v. Hewitt Assocs., 508 U.S. 248 (1993). The undersigned finds no legal support for this proposed cause of action, with its blend of statutory and nonstatutory remedies, as a viable claim upon which relief can be granted. Accordingly, the undersigned concludes that plaintiff's allegations regarding the procedures followed in reviewing her administrative appeal would be properly submitted and considered as grounds supporting her pending ERISA benefits claim, but otherwise fail to state a plausible, independent claim for relief as pled. Cf. McDonald, 347 F.3d at 171 & n.12;

18

Baker v. Metropolitan Life Ins. Co., 2006 WL 3782852 (M.D. Tenn. Dec. 20, 2006).

While plaintiff argues that her conspiracy claim was recognized as a viable cause of action by this court in Jacobs v. Roofing Supply of Nashville, LLC, 2009 WL 855653 (M.D. Tenn. Mar. 30, 2009) (Haynes, J.), the undersigned does not find any particular support for plaintiff's conspiracy claim in that case. Jacobs involved a claim under Tennessee common law of a civil conspiracy to violate the ADA, which was determined to be viable and not preempted by ERISA only against a defendant consulting firm that was not an ERISA fiduciary. Judge Haynes recognized in Jacobs that ERISA, 29 U.S.C. § 1144(a), preempts any such state law claim against a plan fiduciary. 2009 WL 855653, at *4; see also Caffey v. UNUM Life Ins. Co., 302 F.3d 576, 582 (6th Cir. 2002) (finding state law claims preempted where they "stem from the actions of UNUM in the processing of [plaintiff's] claim for benefits."). In the instant case, plaintiff does not purport to allege a state law claim of civil conspiracy, but solely alleges federal question jurisdiction over this case without invoking the court's supplemental jurisdiction, while seeking federal statutory remedies in addition to damages on account of the alleged conspiracy. The undersigned finds that plaintiff's proposed amended complaint fails to state a claim for damages against either Prudential or RRS under any statutory or common law theory of conspiracy.

In sum, should the District Judge reject the recommendation to disallow plaintiff's motion to amend as untimely, the Magistrate Judge would alternatively recommend that the motion to amend be denied by reason of the futility of the requested amendment.

19

## Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motions to amend her complaint (Docket Entry No. 18) and to amend the scheduling order in this case (Docket Entry No. 23) be DENIED for failure to comply with the original deadline for filing motions to amend, or to show good cause excusing this failure, pursuant to Fed.R.Civ.P. 16(b). Alternatively, the Magistrate Judge would recommend that these motions be DENIED on grounds of futility of the requested amendment.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Fed.R.Civ.P. 72(b)(2). Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

ENTERED this 10th day of December, 2009.

　　　　　　　　　　　　　　　　　　s/ John S. Bryant  
　　　　　　　　　　　　　　　　　　JOHN S. BRYANT  
　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE